May it please the Court, Counsel Ashish Mahindra, on behalf of the Appellants. Your Honors, the District Court rejected Appelee's trade secret claims. Nonetheless, based on a presumption and a contractual stipulation, the District Court found irreparable harm existed based on a breach of contract for failure to assign. Our position today is that was error. That was error for two primary reasons. In my presentation, I would like to highlight to this Court that in finding irreparable harm, the District Court ignored the lack of evidence because there was no factual evidence to support irreparable harm. The evidence was contrary. The evidence was speculative. The evidence was fear, apprehension, or concern. Further, the District Court applied a contractual stipulation to boost the apprehension and fear into an elevated state of irreparable harm. Third, in applying irreparable harm, the District Court applied the wrong legal standard. The wrong legal standard was only finding an actual threat. There was no likely finding that the irreparable harm would result in the absence of an injunction. My second point to you will be a discussion about the vagueness and overbreadth of the ultimate relief that the District Court granted. In terms of the facts, Your Honors, the preliminary injunction hearing, long and deep on a Friday lasting 10 hours, showed two witnesses from Appalese, Mr. Spicer, the Vice President of Engineering, and Mr. Kashikar, the CEO of Reveal. These two witnesses were unable to answer any question showing direct, tangible evidence of irreparable harm. To the contrary, these two witnesses, on direct questions from both us and direct questions from Judge Bennett, could only talk about concerns in the marketplace, could only talk about fear or apprehension. Indeed, Statoil presented no witness in the preliminary injunction hearing, yet it still sought a preliminary injunction against Dr. Dawson, Dr. Jim Dawson, and Axiom. The counter picture, if I think, just to jump in, it'll help you to know what I'm thinking, is if the actual likely point isn't a legal error, and so we're really just reduced to is there a factual basis, we'd be reviewing his irreparable harm finding for clear error. And it was a long hearing, and Kashikar does, I'm sure you're going to get to, say, you know, I saw, I'm not hearsay, I saw a PowerPoint that was ours that he'd given to a customer of ours. And in my mind, when you have Kashikar stating that and then Dawson's on the stand for a long time himself denying the forensics, trying to explain the customer base, all of which could have been discredited and was, where do we have clear error to say that the fact finding of irreparable harm as to a customer base, lost market, whatever, what would be a case that would have us find clear error? I have a lot to say in response to that, Your Honor. First, the proposition is it is a de novo review. The case law that we have cited you is clear that as to factual findings, it is a clear abuse of discretion. But as to the legal application of the standard, it is de novo. Right, but I put that aside if I'm not convinced that his remark about actual harm is somehow less than likely substantial harm. Well, Your Honor, under the winter standard that the U.S. Supreme Court standard overturning the Ninth Circuit, the possibility, simple possibility of irreparable harm was insufficient. So the actual threat that the district court conclusively states in its opening paragraph on irreparable harm, which is only a four-sentence paragraph on irreparable harm, three pages devoted to likelihood of success on the merits, four sentences simply on conclusory statements of irreparable harm built on the contractual stipulation, the court has to apply a de novo review because unless there's a likely finding and there's evidence to support the likelihood of irreparable harm, there is no basis on which irreparable harm could be found on an actual threat. And the example I bring to your attention is this. Winter says possibility is not good enough, even though the underlying district court had near certainty that was presented to it in the winter court. We all buckle ourselves up to drive every day to work. Is there an actual threat that you will be in a car accident on any given day? Absolutely. Is it likely that you will be in a car accident? The quantum between actual and likely is completely missing from the district court's opinion. And the fact that the likelihood of meeting an accident or dying in a car accident doesn't exist is what propels us to drive every day. If we didn't have that likely, if the likely fear existed, none of us would actually drive. In this instance, all Kashakar says, to bring back your point on the factual issue, Your Honor, all Kashakar says is I saw a PowerPoint. But what did he see in the PowerPoint? Was there any discussion of any business aspect of axiom that overlapped with reveal? Was there any discussion of a patent application in axiom's wheelhouse that was in reveal's wheelhouse? There is no connection, Your Honor. All Kashakar conclusory says is I saw a PowerPoint. It talked about some image frac related studies. All public is what Dr. Dawson testified about. But he doesn't credit Dr. Dawson because Dawson's testimony about, well, my sister was sufficiently knowledgeable to file the patent and it seemed to me that he heard from Dawson a great deal and Dawson erodes his credibility more and more. So it's hard to rely on Dawson to say there wasn't a poaching of a customer. And then I look at some of the cases they cite, especially that TransPerfect Translations one. It looked like the possibility, the substantial likelihood of poaching customers can be irreparable harm. Your Honor, I would guide you differently because the district court, even in their proposed order, had attached Exhibit A that was under seal for customers that they were going to bill. But the district court rejected all of that. A customer finding, meaning noncontact with an existing customer, is not what Dr. Dawson was being charged with for breach of contract. All he was being charged with was breach of contract for an idea in his head that did not devolve down onto a piece of paper that became Reveal's ownership because it was its personal property. And that's really what this case boils down to. This case is simply who owns a patent application because an idea popped into Dr. Dawson's head. This case is not, Your Honor, as I think you might be construing it as a trade secret case where a customer list is confidential, is a trade secret. Not all confidential ideas must be trade secrets. The breach he did here could still involve confidential information taken. Or wrong. I don't agree with that proposition, Your Honor. I'm not asking. I'm not. Because the point is if the customer list did not have a trade secret moniker on it but was confidential, there's no evidence that Dr. Dawson was actually using that for the purposes of the patent applications. That's the point. The axiom patent applications and the customers are simply not in play as a basis for finding irreparable harm. On the point of what we presented the district court, the cash card testimony, the Statoil Miss Simmons testimony, and the Spicer testimony, again, that Judge Bennett directly questioned them on, simply no witness for Statoil reveal was able to populate evidence before Judge Bennett as to what was it that Dr. Dawson or axiom was doing with respect to the patent applications. Not customer list because that was totally rejected in the district court's finding. What was he doing with the patent applications that reveal your contending is causing harm in the marketplace? There was nothing presented. When I asked Miss Simmons directly in deposition, which is part of the record, what confidential information of reveal or Statoil is in the patent applications? I don't know. Can't tell you. Judge Bennett to Mr. Spicer, give me one instance, one instance in the marketplace, my concern. Judge Bennett cuts him off, says, not concern. I want to know an instance. He cannot give it to him. And all cash card does is talk about this simple notion of my concern that he's using or claiming in the marketplace that a patent application belongs to him related to image frack, Your Honor. Image frack is not in play before this court. The only thing in play is these three patent applications that axiom was, that axiom had in its name. The second point I want to build on, Your Honor, outside of this apprehension and fear or speculative evidence that the Apolese witnesses testified to, is what is it exactly that the district court wrote? The district court wrote that it found an actual threat. But then the second sentence, interestingly enough, becomes an if-then sentence. And under the Roper decision of the Federal Circuit that we cited to the court, that if-then proposition is simply, again, a mask around fear or apprehension. What Judge Bennett writes is plaintiffs have made out a prima facie case that Dr. Dawson is liable on their breach of contract claim. That's the second sentence, going back to likelihood of success on the merits. As such, meaning he's tying the likelihood of success on the merits to his finding, which is now going to come on irreparable harm. As such, plaintiffs would suffer irreparable harm if intellectual property rightfully belonging to plaintiffs, as it was developed by Dr. Dawson while subject to contractual duties above, was used by a competitor offering a competing product. I ask, not quite rhetorically, why does that sentence have an absence in it in identifying axiom as the competitor and identifying the patent applications as the competing product? Judge Bennett could not make that connection because Appellese could not. Your Honor, if this is not a patent infringement case, if this is a case about patent application ownership, why is your record silent on what the patent applications contain? Why did these Appellese not present, as they might in a Markman hearing, detailed evidence to Judge Bennett, this is the Jim Dawson patent application, not patent. This is our technology because this is what Reveal does. No side-by-side comparison. As to the Annalisa Connors patent, simply no discussion from any Reveal or Statoil witness that we do rate cycling. Rate cycling was never part of Reveal's business. As to the Zach Griffin patent, the only thing Sean Spicer could say to Judge Bennett, well, I think this one sentence looks similar to the prose in one of these patents or applications that we pulled back. Your Honor, that is not the basis on which irreparable harm can be found. There is no discussion in the record of what any of these patents do and what Reveal did with respect to these patents, which is why Dawson does try to describe the differences, which then, in your brief, you say it could have been a bouncy house. But if Dawson's discredited in trying to say they're dissimilar, an inference the judge could draw is that they aren't. I mean, you keep avoiding the fact that Dawson tested, in all his explanations, even the forensic overlap in the metadata weren't credited. I think that heavily affected the district judge's assessment of likelihood of harm. Your Honor, I would answer that in two ways. One, I was putting Dr. Dawson onto the stand, and at that point, it was late in the evening, and I didn't know what Judge Bennett's questions were at that point. I turned Dr. Dawson over to Judge Bennett to ask whatever it is that Judge Bennett had on his mind. Forty-five minutes later, all Judge Bennett got, not all, substantially what he got was unrebutted testimony that rate cycling is not part of Reveal, Zach Griffin patent was never part of Reveal's wheelhouse, and the Jim Dawson patent came four months before Reveal even thought about profit mapping. That's unrebutted testimony. There can't be any inferences that can be drawn from that. Now, if Judge Bennett wanted to—my time is up, Your Honor, sorry. You've saved time for rebuttal. Okay. Hahn? Good afternoon, Your Honors. William Hahn of Sherman & Sterling. Let's just start with the question that Mr. Mahindra posed, and I wrote it down like this. What was Mr. Dawson doing with the patent applications that was causing harm in the market? Those are his words, not mine. Well, Dr. Dawson was doing a number of things that were causing harm in the market, Your Honors. First, he used one of the secret patent applications, the Jim Dawson patent application, to secure equity funding for a competitor that would go out and destroy Reveal's first-mover advantage with its stolen improvements to its technologies. Second, he was going to customers, as Mr. Kashykar testified, with Reveal's own marketing materials and validation studies setting forth similar services as to what Reveal offered. Is this all related to the patent applications? Mr. Kashykar testified that they were similar services, and Mr. Dawson himself admitted in testimony to Judge Bennett that he was contacting customers, Reveal customers, about what he was doing at Axiom. This preliminary injunction herein, Your Honors, is about a breach of Dr. Dawson's contractual obligations to keep confidential, disclose, and assign to Reveal all discoveries, improvements, and ideas he made as Reveal's CTO and, correspondingly, his use of those stolen improvements to build a competitor that would destroy Reveal's first-mover advantage in the nascent niche fracture mapping market. The irreparable harm that is the legal issue before you here, therefore, has to do with Dr. Dawson's theft and his use of that theft, whether appellants should be free to compete against and destroy Reveal's first-mover advantage with Reveal's own stolen improvements. Nothing in the law and nothing in the record shows an abuse of discretion in the district court concluding that this harm is irreparable. Appellants' attempts to reweigh the evidence with red herrings cannot divert this court from what the district court found by, in its own words, overwhelming evidence. First, the Dennis... What's an example of a red herring? A red herring would be, for example, that perhaps Dr. Dawson was dealing in gardening equipment and balancing houses while he was at Reveal, as opposed to the groundbreaking fracture mapping technology. That would be one red herring. Another red herring, for example, would be its characterization of the preliminary injunction order as an industry-wide non-compete, which appellants then go to undermine on page 28 of their reply brief, where they call it an extreme interpretation of the preliminary injunction order. There was overwhelming evidence, not only that Dr. Dawson breached his contractual obligations with respect to stealing Reveal's improvements, but then was using them to build a competitor. Specifically, the district court found, and you pointed out, Judge Higginson, Dennis Williams' testimony, metadata obtained from Dr. Dawson's computer showing that he accessed confidential Reveal files, stole them, and used Reveal's improvements in secret patent applications filed in the names of his wife, sister, and friend. Second, Dr. Dawson then used, as I said, Judge Smith, one of those patent applications to obtain equity funding for a competitor designed to usurp Reveal's market exclusivity. Third, again, as Mr. — oh, he also promised his sister indemnity to assign her patent application to Reveal, as well as thousands of dollars to do so. Third, as Mr. Kashykar saw, Dr. Dawson was using Reveal's marketing materials and validation studies to pitch Axiom to Reveal customers. Indeed, Dr. Dawson himself confirmed that Axiom's goal is to eclipse Reveal in two separate filings. If you look at paragraph 16 of the answer they file, they say that one of the purported flaws of image frac is that it doesn't do real-time monitoring of fracture pressures. In the very same document, paragraph 65, they say that the gift of Axiom to the market is precisely that it will do this real-time monitoring. The event — oh, sorry. When you start out by saying the finding would be that destroyed the first-mover advantage — Yes. — is there case law that — that gets my brain a little confused. You know, I'd love to see it if there were any finding that there's less market share or this customer has been lost. Those findings don't exist, right? No, Your Honor, and they don't have to. As the Buttonamax case that we cite on page 29 of our brief points out, Buttonamax, it's a — Is that a circuit decision? No, no, Your Honor. It's a District of Delaware decision, but it does discuss the first-mover advantage as the concept of being the originator, the brand of being the originator, the ability to direct the trajectory of the market's innovations, the customer loyalty that can come from going first. Dr. Dawson himself, moreover, it's undisputed that Reveal has this. Dr. Dawson himself said that Reveal has the recipe for Coke and that, perhaps most tellingly, if the competitor — if a customer or a competitor knew about Reveal's ideas and discoveries, the damage to Reveal's competitive position would be, quote, impossible to put back. That is a — Is that a verbatim quote? Yes, it is. Record on a — Reveal has the recipe for Coke. Reveal has the recipe for Coke. That's record site 3158. And in the very same email, he says it would be impossible to put back. That is the very definition of irreparable harm, Your Honors. And that's like the stipulation he agreed to, which couldn't alone, but the law is clear, it can be a factor. Is that a fair statement of the law? Yes, Your Honor, it can. And I think it's notable, Your Honor, that on page 37 of the — of Appellant's opening brief, they mischaracterize and misstate what the district court said with respect to the use of that contractual stipulation. They block, quote, the portion discussing irreparable harm, and they notably omit the word further from the block quote, which is very clear that that is the  That is how the district judge was using it. Moreover, as the district court found, that reveal would be significantly harmed if Axiom destroys its market exclusivity in a — in a market that, as the district court said, reveal solely occupied. Indeed, Dr. Dawson, as I said himself, he acknowledged this most tellingly by saying that the loss would be impossible to put back, and that is the very definition of irreparable harm. And they ask you, Appellant's asking this Court to second-guess this mountain of evidence, this overwhelming evidence, as the district court called it, simply by regurgitating the same incredible arguments they set forth below. They offer the testimony of — When you say overwhelming, did that come from the substantial likelihood portion of the order, or is that in the irreparable harm finding, or you're saying the two are integrated? What the district court said, Your Honor, is that Dr. Dawson said that none of the intellectual property in the orders was created by him, and that statement is contradicted by overwhelming circumstantial evidence. Okay. But why would that prove irreparable harm that couldn't be monetized, you know? Well — well, so, Your Honor, this Court's cases have used the same evidence in support of substantial likelihood. Well, Union Carbide, for example, uses the Newcourt incident as both the likelihood of success on the merits and irreparable harm. The Janvey case that Appellant's cite uses a massive Ponzi scheme as example of both likelihood of success on the merits and irreparable harm. And the Paulson case, though it doesn't deal with likelihood of success on the merits, speaks to the broader point that irreparable harm was found in the balance of inquiry or balance of equities analysis, and the irreparable harm doesn't necessarily affect just one element of the analysis. But they're asking you, as you pointed out in questioning of Appellant's counsel, Your Honor, that the testimony of Dr. Dawson was contradicted by overwhelming evidence. They wave away the forensic metadata analysis essentially by saying anyone could be Matt Dawson. They say with a straight face that Annalisa Connors, someone with no experience as an inventor, let alone in the fracking space, someone who never saw her patent application before it was filed, and does, as Dr. Dawson said at the hearing, lighting designs for buildings, nevertheless filed as Appellant's answer characterizes Axiom's aim, the next big development in the fracking industry. Given Appellant's incredible arguments, frankly, the district court would have abused its discretion if it ignored that mountain of evidence in contradiction to those assertions. So we view that this Court should conclude the same and affirm the district court. I think it's important also, Your Honor, just to point out this question about Axiom not really competing with Reveal. Axiom was absolutely competing with Reveal for all of the reasons I just said. But to the extent that some of the information that we didn't, you know, they say a lot about rate cycling and how we're not in that space. Well, Dr. Dawson breached his disclosure and assignment obligations. We weren't doing it because we didn't know. But if you look at the IP roadmap that Dr. Dawson prepared, that's at record site 3156. And then you also look at the business development plans that he put together for Reveal at record sites 3170 and 71. You show that, first of all, Reveal is desiring a brand as the de facto standard for fracture mapping. They list out a number of potential patents and trade secrets that could be filed by Reveal that bear upon all of the information that we know about the secret patent applications. But more fundamentally, this is not, Appellant's counsel interestingly asked for a Markman hearing or suggested the propriety of a Markman hearing. This is not a patent infringement case. Dr. Dawson breached his confidentiality obligations, stole our improvements, and built a competitor designed to destroy our first mover advantage. This is not a competitor arguably infringing against a product we have. This is theft. He stole our improvements. But Mr. Mahindra is careful to say this is not a trade secret case. Do you agree with that? I agree with you. It's not a trade secret case, although I would think that the representation from Appellant's that it's not a trade secret case is interesting because throughout this case they have said that this is all about trade secrets. In fact, they conflate the idea that we need to even talk about breach of contract at all because we didn't show trade secret misappropriation. That was at record site 1132 paragraph 6. That was in the district court. So I agree with you, Judge Smith. It's not a trade secrets case. It is a breach of Dr. Dawson's confidentiality obligations. But you were making reference before I asked the question to stealing and stole. Yes. Stole what, if not trade secrets? He stole our ideas, discoveries, and improvements as articulated in the confidentiality obligations. Those were not trade secrets? Your Honor, we don't need to make a representation about what is and what is not a trade secret to prevail on our breach of contract claim. The confidentiality obligations do not reference trade secrets. They reference ideas, discoveries, and improvements. What the trade secrets are, whether they are, that is for another day, Your Honor. If I could turn briefly. What would be important to me, Macy, is to get you to the standard of review because at the outset of his argument he said it's de novo. Yes. Well, we disagree with that, Your Honor. I mean, this is, as you pointed out, a clear error case. Appellants cannot cite to a single case where the usurpation of someone's hard-earned market exclusivity is not irreparable harm or the disclosure of confidential information and the potential loss of customers is not irreparable harm. So we are left to resort, as you pointed out, Judge Higginson, to resort to whether or not the district court committed clear error in weighing the evidence and notably the arguments that were set forth by appellants. You should credit this testimony over that testimony. This testimony was more insightful. The lack of testimony here was more insightful. That is all reassessing credibility. That is all clear error standard of review. Are you using the clear error standard of review as a subset of the prongs for abuse of discretion? I think that that's right, Your Honor. Abuse of discretion is the ultimate decision to grant or deny a preliminary injunction is abuse of discretion. Right. The legal questions are, you know, the proper standards, as you pointed out, de novo, and then clear error factual determinations. And witness credibility falls within factual assessments, Your Honor. And so how much leeway do you find there is with abuse of discretion when it's cabined within de novo review for legal issues and clear error of factual findings? I think that there is considerable leeway when, as this Court pointed out in Cardone, when there's been an individualized assessment of whether confidential information was disclosed or likely to be disclosed, then there is plenty of room for abuse of discretion. And there was that here. Appellant's counsel characterized what happened below as a mini trial. I mean, you heard him call it a long day. It was. So there is an ample record here. There is a mountain of evidence. What was the driving force behind the possibly longest TRO in the history of man where the hearing was six months after this action was filed on the preliminary injunction? Right. Y'all kept agreeing to an extension of the TRO. Yes. And all of this discovery was taken. What was the driving force behind that? There was, as I understand, Your Honor, there was an agreement between trial counsel for it to continue extending the TRO. The parties had entered into some settlement discussions. So that was part of it. How does the PI differ from the TRO? The PI is different from the TRO in a number of respects, Your Honor. We talk about the vagueness and overbreadth. Yes. And we speak about that to some extent in our brief discussing the differences between the TRO and the PI. To a certain extent, I think that the PI is actually narrower than the TRO in the sense that the language about confidential information in the PI refers to relating to our underlying image frack. It's arguably broader than the TRO. In the TRO, there's also a restraint on contacting customers. That restraint is not present in the PI. There's also, perhaps most notably, we are also enjoined in the preliminary injunction from asserting ownership rights in the patents. That was not a part of the TRO. How about addressing the claim that the preliminary injunction is vague? Yes, Your Honor. I think what we see in the vagueness arguments is that appellants would like this detail standard. Dr. Dawson testified as to what the words in the preliminary injunction that he considers to be vague mean. We go through that testimony at some length at pages 46 to 50 of our brief. And the injunction itself, as this Court suggested was acceptable in ITT education services, is no broader than what we agree to in the TRO. As I was answering your question, Judge Higginson, if anything, it's arguably narrower. It's no broader than what we agree to in the TRO. Certainly no broader than what Dr. Dawson agreed to in his secondment acknowledgement with respect to the confidentiality provisions. So we do not see, and moreover, appellants make an argument in their reply brief about this, referencing an other document. They really don't mention anything about that in their opening brief except for a throwaway sentence on page 51 that doesn't actually apply law to fact. But if you do want to consider the argument, there are really two responses to it. One is a sort of practical point. If you're going to enjoin someone from prosecuting certain patent applications, why wouldn't you mention the patent applications by serial number? That would be like enjoining someone from using a particular bank account and not specifying the bank account. And that's all the reference to the other document happens here. But also I think there's a helpful contrast. This Court in Gulf King-Shrimp, if you look at the footnote 10 in that case, has the injunction laid out. That injunction required you to look to the statute for a definition of interstate commerce, forced child labor, look at regulations for definitions of wages. We have nothing like that here. And nevertheless, this Court found that that injunction was not vague for purposes of rules or violated the other document reference in Rule 65. Ultimately, Your Honors, as this Court said in Texas v. United States, a fundamental principle of preliminary injunctions is that they are of no help. They are pointless if you have to sit around and wait until you are actually harmed before you can get injunctive relief. Reveal should not have to sit around and wait until its first mover advantage is The District Court should be affirmed. All right. Thank you, Mr. Holland. Mr. Mahindra, you save time for a vote. May it please the Court, Counsel. Your Honors, all you heard in Apley's presentation were buzzwords, first mover advantage. You asked the pointed question, what is it about these patent applications that Reveal was doing? They can't tell you. All they say is, well, we didn't know. We didn't know what was in his head until we conducted discovery. Judge Barksdale, you asked, the longest TRO in mankind, 300,000 documents produced by us, 10 depositions. They have nothing. They cannot answer the simple question, what is it in the Annalisa Connors patent application, not patent, that you contend Reveal belongs to you, and what is it that then Axiom Genesis or Dr. Dawson went out in the marketplace and did with the Annalisa Connors patent that irreparably harmed you? All they can do is couple likelihood of success on the merits with irreparable harm, all undergirded by a contractual stipulation. In the White v. Carlucci opinion, this Court, as authored by Judge Smith, said you cannot take a strong likelihood of success on the merits and build an irreparable harm case on that. You have to show separately and convincingly, as written in White v. Carlucci, there is no separate and there is no convincing proof. All Judge Bennett does at Apolli's request is say, as such, because there's a prima facie case of breach, I find irreparable harm, and further A letter of stipulation by Dawson of irreparable harm. The further language that they point to, Judge Barksdale, but it's built on likelihood of success on breach. I find irreparable harm because if a competitor were offering competing product, not Dr. Dawson or Axiom, and then further the contractual stipulation of irreparable harm. I pointed you to in our brief the soliloquy between Judge Bennett and Mr. Fernandez, counsel for Apolli's. In that questioning, Judge Bennett said, I've listened to the testimony. I haven't heard of anything in the marketplace that is taking place that would support irreparable harm. What does Mr. Fernandez concede at that point? He concedes we've got to go back to the contractual duties of irreparable harm. He tries to build his answer on the hearsay, and the hearsay doesn't support irreparable harm. Will you go ahead and address the Rule 65 issue? Yes, Your Honor. So on the Rule 65 issue, we've got two or three concerns with the district court's order as it's written. First, the total application of patents and technology and the overlap that that is embedded as written in the order prevents Dr. Dawson from taking any position in the fracking industry. Because you, Your Honors, do not know what is in the patent applications, Dr. Dawson doesn't know what's in the patent applications. He may be the smartest guy in the room, but that doesn't mean that the ordinary person who's looking at subparts A, C, or E of the district court's findings can say, this is what I as an ordinary person know can or can't be done by Dr. Dawson in the fracking industry. The reliance and the embedding of the patent applications is impermissible under Rule 65D. We've also argued that the overbreadth in the patent applications establishes an industry-wide non-compete. Were they relied and embedded similarly as in the TRO? Or did it become more vague once the injunction issue? On the TRO, Your Honor, it was agreed. I haven't done a side-by-side comparison per se. Against this notion that what now exists is too vague for him to understand what's prohibited? Your Honor, under the Shedler opinion that we've cited from this court, this court looks to a Ninth Circuit opinion, Thomas v. County of Los Angeles, and both Shedler and Thomas look at what are the rules and procedures of the sheriff of the County of Los Angeles? What are the rules and procedures of your organization under Shedler? That's insufficient. That Dr. Dawson may know as a sheriff in the County of Los Angeles what the policies are with respect to the issues in that opinion is not the barometer on which Rule 65D would operate. If that were the case, then we would have this giant yo-yo of interpretation. Under a due process standard, which is what 65D is trying to accomplish, sorry, Your Honor, my time is up. No, that's all right. You can finish your sentence only. Okay. Under the due process standard of Rule 65D, if Dr. Dawson is to be held in contempt of a violation, he must know, as an ordinary person must know, what was he enjoined from doing. All right. Thank you. Thank you, Your Honor. The case is under submission, and the Court will take a brief recess before hearing the final two cases.